UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
In re:

                                                Chapter 11

TA-COLONIAL TRADITIONS LLC,          Case No. 11-20270 (__)

                   Debtor.
---------------------------------------------------------------x

### DECLARATION OF MICHAEL SALZMAN, MANAGER AND MEMBER OF SM TRADITIONS ASSOCIATES LLC, THE MANAGING MEMBER OF THE DEBTOR AND DEBTOR-IN-POSSESSION IN SUPPORT OF THE CHAPTER 11 PETITION AND THE FIRST DAY PLEADINGS

**Michael Salzman** declares pursuant to 28 U.S.C. §1746 as follows:

1.     I am the Manager and Member of SM Traditions Associates LLC, which is the Managing Member of TA-Colonial Traditions LLC the above-captioned debtor and debtor-in-possession (the "Debtor").[1] I have served in this role since February 2007.

2.     I have been authorized to and submit this declaration (the "Declaration") on behalf of the Debtor and in support of the Debtor's voluntary petition for relief under chapter 11 of title 11, United States Code (the "Bankruptcy Code"), filed on February 16, 2011 (the "Petition Date") and its first day pleadings.

3.     Unless otherwise indicated, all of the facts set forth in this Declaration are based upon my personal knowledge of the Debtor's books and records, operations and finances, and information that has been learned from (a) the review of the Debtor's financial reporting and other relevant documents, (b) information supplied to me by the Debtor's management, including but not limited to the Debtor's former property manager, an affiliate of Colonial, (c) information supplied to me by Lincoln Apartment Management Limited Partnership (hereinafter

---

[1] The Debtor is a Limited Liability Company which has 2 members: (1) SM Traditions Associates LLC ("SM Traditions"), the Managing Member with a 65% share of the Debtor's equity; and (2) Colonial Entities Trust L.P. ("Colonial"), a member with a 35% share of the Debtor's equity.

BSS/856751.1/058700

"Lincoln"), the court-appointed Receiver for the Complex (as defined below), and (d) information learned from the Debtor's advisors, financial or otherwise.

## BACKGROUND

4.      On the Petition Date, the Debtor commenced this case under chapter 11 of the Bankruptcy Code, in the United States Bankruptcy Court for the Western District of New York (the "Court").

5.      The Debtor is a "single asset real estate" debtor as defined by Bankruptcy Code § 101(51B)[2]. The Debtor's only business activity is the operation of a 324-unit rental apartment complex in Gulf Shores, Alabama (the "Complex"), from which substantially all of the Debtor's income is generated.

6.      The Debtor was formed in or about February 2007 (the "Formation") to develop "Colonial Grand at Traditions", which is a 324-unit apartment community, on a 36.85 acre tract of land, in Gulf Shores, Alabama. In or about the same time period as the Formation, Regions Bank ("Regions") and the Debtor entered into a credit agreement that provided for a loan in the approximate amount of $34.1 million for the development and construction of the Complex (the "Prepetition Credit Facility").

7.      As described in more detail below and in the Debtor's Emergency Motion for Use of Cash Collateral, the Debtor, pursuant to Bankruptcy Code § 543, seeks the turnover of the Complex and any and all derivative assets, including the post-petition rents (collectively the "Rents" and together with the Complex, the "Collateral") from Lincoln (as the Receiver of the Complex), so as to allow the Debtor to be in possession of all its property and management of

---

[2] Bankruptcy Code § 101(51B) provides that:

> [t]he term "single asset real estate" means real property constituting a single property or project, other than residential real property with fewer than 4 residential units, which generates substantially all of the gross income of a debtor who is not a family farmer and on which no substantial business is being conducted by a debtor other than the business of operating the real property and activities incidental.

11 U.S.C. § 101(51B).

BSS/856751.1/058700

its affairs pursuant to Bankruptcy Code §§ 1107(a) and 1108.  Simultaneously, the Debtor seeks to employ Lincoln as property manager for the Complex, subject to the terms and conditions more fully described in the proposed interim cash collateral order.  By this mechanism, the Debtor seeks to affect compliance with Section 543 while maintaining continuity of management of the Complex and preserving and protecting the Complex for all parties in interest, especially the tenants.  To date, no trustee, examiner or committee has been appointed in this proceeding.

**Formation of the Debtor**

8.      In the wake of Hurricane Katrina, the United States Congress passed the Gulf Opportunity Zone Act of 2005 (the "GO ZONE Act"), which was written to encourage the rebuilding of housing in the regions surrounding the Gulf of Mexico (the "GO ZONE" incentives).  Thereafter, in the summer of 2006, the Salzmans[3] were contacted by Colonial and entered into discussions with representatives of the Colonial and its affiliated entities (collectively, the "Colonial Entities")[4], to explore the possibility of the Salzmans co-investing on a project to develop the Complex.

9.      During the discussions, it was represented to the Salzmans that the Colonial Entities had extensive experience in developing, constructing, and managing apartment properties, much like the Complex.  It was further represented to the Salzmans, that because of the GO ZONE incentives, apartment projects along the Gulf of Mexico were both low-risk and highly profitable.  Moreover, the Salzmans were further assured that the Colonial Entities could secure favorable financing for the Complex from a local bank (Regions) with which it had a close working relationship.

---

[3] Stephen and Michael Salzman (collectively, the "Salzmans") are the principals of SM Traditions.  SM Traditions was formed for the sole purposes of participating in and making an investment into the ownership of the Debtor.

[4] The Colonial Entities consist of: (i) Colonial Properties Trust; (ii) Colonial Properties Services, Inc.; (iii) CRLP-Colonial Construction Services, LLC; and (iv) Colonial Entities Limited Partnership.

3

BSS/856751.1/058700

10.     During the summer and fall of 2006, the Colonial Entities told the Salzmans that the development and construction of the Complex was substantially "bid out," meaning that the hard costs of development and construction had been established and were known to the Colonial Entities, and the only aspect of the project still unknown were the costs associated with landscaping the Complex.

11.     The Colonial Entities had further represented that the total development and construction costs would be approximately $33 million, and that the portion of the Complex that was already "bid out" would cost approximately $31.5 million.   In furtherance of this representation, the Colonial Entities provided the Salzmans with a *pro forma* analysis evidencing the same.[5]

12.     Using the GO ZONE Act's tax advantages and the foregoing assurances as a lure, the Colonial Entities together with Regions combined to induce the Salzmans into investing at least $6.1 million dollars into the Debtor to develop the Complex (the "Investment").   As part of the inducement for the Investment, the Salzmans were promised accounting transparency and ultimate authority as Managing Member over the development and operation of the Complex.

13.     Subsequent to the Investment, the Colonial Entities (a) misrepresented the costs to develop and construct the Complex, and (b) failed to provide the accounting transparency and ultimate authority over the development and operation of the Complex, as contracted for. Moreover, after SM Traditions had committed the Investment, SM Traditions was prevented from participating in any portion of the development, construction, and management of the

---

[5] In their Answer and Counterclaims (the "Answer") to the Complaint (defined herein), the Debtor and SM Traditions allege (a) that at the time the Colonial Entities provided the Salzmans with the *pro forma* analysis for the development and construction of the Complex, the Colonial Entities were aware that the *pro forma* analysis was materially false, and intended for the Salzmans to rely on a falsified set of costs; and (b) that the projected development and construction costs of the Complex were significantly over-inflated.

4

BSS/856751.1/058700

Complex (collectively, the "Operations"), as the Colonial Entities seized complete control of the Operations.

14.     The Colonial Entities used their control over the Operations and the active parties portion of Regions to conceal certain activities, which in turn allowed the Colonial Entities to ultimately siphon out of the Debtor (during both the development and construction, and the operation and management of the Debtor), at least double the amount of money it was entitled receive for its role in the Complex.[6]

**The Development and Construction Agreements**

15.     As a condition of formation of the Debtor, the Colonial Entities insisted that the Complex be developed and constructed by its affiliated companies.  The Colonial Entities represented that they would take a fee of four (4%) percent for development and a five (5%) percent fee for construction of the Complex.  To memorialize the transaction, the Colonial Entities prepared a Construction and Development Agreement (the "Development Agreement"), which was executed by a representative of the Colonial Entities on behalf of the Debtor and each of the two Colonial Entities responsible for the development and construction.  Thus, despite the fact that SM Traditions is the Debtor's managing member, the Development Agreement was executed, on all sides, by the Colonial Entities.

16.     The Development Agreement called for a "Guaranteed Maximum Price" of $31.5 million, based on hard costs of $28 million.  A provision for "Guaranteed Maximum Price" was common in agreements similar to the Development Agreement.  Such agreements also contain provisions for occurrences of cost savings.  Normally cost savings are to benefit the owner (in this case the Debtor) or split between the owner and the contractor.  The Development Agreement however, was modified to pass all of the "savings" on to the Colonial Entities, with no portion being reserved for the Debtor.  Of course, this modification, like the Development

---

[6] The Answer also alleges that Regions was complicit in deceiving SM Traditions by knowingly over lending to the Colonial Entities on the development and construction of the Complex.

BSS/856751.1/058700

Agreement itself, was negotiated, on both sides, by the Colonial Entities to the total exclusion of the SM Traditions. (A copy of the Answer has been annexed hereto as **Exhibit "A."** For a more detailed explanation of the allegations regarding the development and construction of the Complex, including monies alleged to have been wrongfully diverted to the Colonial Entities, the Court is respectfully referred to the Answer.)

**The Management Agreement**

17.     Another condition to the Debtor's formation was the insistence that the management of the Operations be controlled by one of the Colonial Entities. As a result, the Debtor entered into a Multifamily Management Agreement ("Management Agreement") with one of the Colonial Entities.

18.     Under the terms of the Management Agreement, SM Traditions retained ultimate control over all management decisions concerning the Debtor and the Complex. Under the Management Agreement, the Colonial Entities were required to operate the Complex as an agent and fiduciary of the Debtor, pursuant to the terms set forth in the Management Agreement. Despite the provisions of the Management Agreement, SM Traditions was not only prevented from participating in management decisions concerning the Debtor and the Complex, but, the Colonial Entities failed to act on directives from SM Traditions as required and was acting, at all material times, for the exclusive benefit of the Colonial Entities and Regions.

**Regions Loan**

19.     Regions and the Colonial Entities have a long history and relationship, and they have engaged in numerous business transactions together, including the financing of a number of joint ventures with the Colonial Entities similar to the Prepetition Credit Facility and construction of the Complex.[7] Projects similar to the Complex where the Colonial Entities and Regions had lending relationships included projects in Austin, Texas and Nashville, Tennessee.

---

[7] The Answer alleges that Regions' primary concern relative to any particular joint venture development

BSS/856751.1/058700

20.    At the urging and recommendations of the Colonial Entities, and upon reliance on the representations made to SM Traditions concerning the development, construction, and operation of the Complex, in March 2007, the Debtor entered into the Prepetition Credit Facility with Regions.

21.    Pursuant to the Prepetition Credit Facility, Regions would only disburse funds to the Debtor solely upon the presentation of draw requests and certificates for payment showing specific development and construction costs that needed to be paid.  The Colonial Entities were responsible for the preparation, verification, and submission of these draw requests and certificates for payment, to Regions.

**Financial Irregularities in the Construction and Operation of the Complex**

22.    Construction of the Complex continued throughout 2007 and 2008.  During construction of the Complex, the Colonial Entities provided the Debtor and SM Traditions with monthly project cost reports.  As both developer and contractor, the Colonial Entities prepared and submitted certain reports used to both keep the Debtor and SM Traditions informed as to the Complex's construction and to make draws on the Prepetition Credit Facility.

23.    From April 2007 through April 2008, draws totaling approximately $33.4 million were made against the Prepetition Credit Facility based on the cost reports submitted by the Colonial Entities.

24.    In early 2009, the Debtor expressed concerns, based on an independent appraisal of the Complex, that the total cost of the Complex significantly exceeded that of comparable projects in the area.  The Colonial Entities vehemently denied that costs on the Complex were inflated, insisting that the Colonial Entities had collectively only made a profit of

---

project involving the Colonial Entities was not the viability of the particular project, or its relationship with the borrower, but the overall profitability of the Colonial Entities.

  The Answer further alleges that Regions admitted to a representative of the Debtor that resolution of Prepetition Credit Facility has and was to be tied to a resolution of a Regions loan on the Colonial Entities' Nashville project – a project that had no connection to either the Debtor or to the Complex.

7

BSS/856751.1/058700

approximately $2.26 million – the numbers reported to the Debtor and Regions on the monthly cost reports. Despite this assertion, in August 2009, the Debtor was informed by its accountant that the fixed assets statement provided by the Colonial Entities reflected project costs approximately $3 million lower than the project cost reports provided to the Debtor. The Colonial Entities defended the discrepancy by stating that the $3 million dollars were actually cost "savings", and thus the sole property of the Colonial Entities based on the Development Agreement.

25.    As a result of this financial irregularity, the Debtor was twice forced to restate its financial statements, which in turn lead to an Internal Revenue Service audit of the Debtor's tax returns. To date, the audit is still open and ongoing.

26.    Separately, in early 2009, the Colonial Entities claimed expense overages of approximately $440,000 relating to the Operations of the Complex, and requested payment from the Debtor. The expenses were not approved by SM Traditions, as was required by the Management Agreement. SM Traditions and the Colonial Entities agreed these expenses were no to be paid, however, in contravention of the Management Agreement and without SM Traditions' authorization, the Colonial Entities used its control over the Operations to reimburse itself for these overages.

27.    During the course of development, construction, and operation of the Complex, SM Traditions regularly requested and was regularly denied access to the Debtor's books and records by the Colonial Entities. Moreover, the Colonial Entities refused to provide a full accounting for funds being transferred between the Debtor's bank accounts and to allow SM Traditions full unfettered access to the Debtor's books and records as required by the Management Agreement. The Colonial Entities even went so far as to move the Debtor's bank accounts from Regions to another institution without authorization or notice to the Debtor or SM

BSS/856751.1/058700

Traditions, in contravention of both the Prepetition Credit Facility and the Management Agreement.[8]

28.     Repeatedly, Regions and the Colonial Entities blocked the Debtor and SM Traditions from discussions related to the Prepetition Credit Facility, which prevented the Debtor and SM Traditions from effectively monitoring the Complex's finances.   More importantly however, was that the denial of access to financial information aided the Colonial Entities in extracting funds from the Debtor to which they were not entitled.

**Regions Calls the Loan as Due**

29.     The Complex began leasing apartment units in late 2007.

30.     Although the Colonial Entities had represented to SM Traditions that the apartments would be leased for $1,000 per month, the Colonial Entities never actually received $1,000 per month for any of the units rented since the Complex opened.[9]

31.     In fact, by the middle of 2008, the apartments were being leased for an average monthly rental of approximately $600 per month – a 40% decrease from the representations made by the Colonial Entities.

32.     With the Complex generating far less income than the Colonial Entities had represented it would, Regions called the loan as due on April 15, 2010.  As of October 12, 2010, principal and accrued interest on the loan totaled approximately $34.6 million.

33.     The proceeds of the loan, some $33 million plus, were borrowed by the Debtor to pay the Colonial Entities to develop and construct the Complex.[10]  Regions now claims that the Complex is only worth $14 million.[11]

---

[8] The Answer alleges that when the Debtor attempted to address the fact that Colonial Entities had moved the Debtor's bank accounts from Regions without approval and in violation of certain agreements with Regions, Regions dismissed the matter by stating that the Colonial Entities were its "partner" and that Colonial Entities did not need to adhere to the requirements in the Debtor's agreements with the bank.
[9] Although certain of the units were rented for $1,000 per month, in order to rent for this amount, the Colonial Entities were offering significant rebates to entice renters to lease in the Complex.

[10] The Answer alleges that an executive of Regions admitted to Stephen Salzman that Regions over-lent

9

BSS/856751.1/058700

34. If Regions' current valuation is accurate, this means that the Complex is now worth less than half what the Colonial Entities were paid to develop and construct the Complex and only one-third of what Regions purportedly had the Complex appraised for in 2007.

35. On October 15, 2010, Regions filed a complaint (the "Complaint") seeking (a) damages for breach of the Prepetition Credit Facility, and (b) the appointment of the Receiver.

36. On October 19, 2010, the Circuit Court for Baldwin County Alabama entered an Order (the "Receiver Order") appointing Lincoln as the Receiver of the Complex and other assets of the Debtor effective October 26, 2010. The Debtor's day-to-day operations previously were managed by one of the Colonial Entities, as a result of the Receiver Order, the management of the Complex is under the control of Lincoln. Regions sought, and was granted powers for the Receiver in the Receiver Order, that were expanded beyond the allowed language contained in the Prepetition Credit Facility.

37. Regions alleges that, thereafter, it sold the Prepetition Credit Facility to MLQ-ELD, L.L.C. ("MLQ"). On January 20, 2011, MLQ served a Notice of Foreclosure on the Debtor and intended to sell the Complex at a public auction on or after February 9, 2011. Thereafter, on January 28, 2011, MLQ served a Notice of Adjournment adjourning the scheduled Foreclosure Sale to February 18, 2011.

Assets and Liabilities

38. The foregoing factors have dramatically reduced the working capital available to the Debtor thereby forcing the Debtor into a situation where a sale of the Complex is inevitable.

---

on the Complex based solely on the bank's close relationship with the Colonial Entities.

[11] In the Complaint, Regions alleged that the property was worth $14 million. While the Debtor may not agree with that valuation, it is a clear indication that Regions believes its secured claim is materially less than its stated claim.

10

BSS/856751.1/058700

39.    The Debtor's liabilities include tenant deposits, certain unpaid tax liabilities, vendor expenses and the aggregate unpaid balances of the Prepetition Credit Facility, including accrued interest, fees and expenses of approximately $34.1 million.

40.    The Debtor's assets are comprised primarily of the Complex and the furniture, fixtures and equipment associated with its Operations.

41.    I believe that due to the downturn in the real estate market created by the recession, which coupled with the Horizon Deepwater oil spill, the fair market value of these assets are less than the $14 million Regions claims to be the value of the Complex.  I also believe however that given the opportunity to use the rents[12] generated on the Complex, the rents would provide sufficient cash flow to allow the Debtor by Lincoln as property manager to preserve and protect the Complex and provide adequate protection payments to the lender.  All of the Debtor's income is dependent on its ability to rent as many of the units in the Complex as possible.

42.    The Debtor hopes to remain in chapter 11 only for a very limited period of time, while it makes arrangements for an orderly sale under a plan of liquidation pursuant to Bankruptcy Code §§ 1123 (a) and (b) (the "Plan").  The relief sought by the Debtor at this time merely preserves the status quo in a manner consistent with the Bankruptcy Code, while protecting the Complex and the interests of the lender.

43.    The Debtor believes that with the protection of this Court, it will be able to marshal and preserve its assets, and obtain the highest possible value for those assets through a sale under the Plan.

**WHEREFORE**, your deponent requests that Lincoln be directed to turnover property of the estate pursuant to Bankruptcy Code § 543.  Your deponent further requests that the Court

---

[12] The Complex generates gross rents of approximately $200,000 per month and rents of approximately $180,000 per month net of concessions on the tenant leases.

BSS/856751.1/058700

authorize the simultaneous employment of Lincoln, in the ordinary course of business, as property manager for the Complex, under similar rights and powers as it is acting now, as described more fully in the Interim Cash Collateral Order. The employment of Lincoln as property manager, allows the Debtor maintain the status quo, while also providing it the opportunity to manage its business and financial affairs pending further order of this Court.

Pursuant to 28 U.S.C. §1746, I declare under the penalty of perjury that the foregoing is true and correct.

Dated: Pittsford, New York
February 16, 2011

s/Michael Salzman
Michael Salzman, Managing Member of
SM Traditions Associates LLC, the Manager
of TA-Colonial Traditions LLC, Debtor and
Debtor-in-Possession

12

BSS/856751.1/058700